# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

N⁰ 14-CV-546 (JFB)

KEITH BUB,

Appellant,

VERSUS

ROCKSTONE CAPITAL, LLC, OFFICE OF THE UNITED STATES TRUSTEE, AND
KENNETH KIRSCHENBAUM,

Appellee.

**MEMORANDUM AND ORDER**
June 25, 2014

JOSEPH F. BIANCO, District Judge:

Keith Bub ("Bub" or "debtor") appeals from an order entered by the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") in the underlying bankruptcy proceeding. After trial and in an opinion dated November 13, 2013 (the "November 13 Order" or "Bankr. Ct. Op."), the Honorable Robert E. Grossman denied debtor's discharge, pursuant to 11 U.S.C. § 727(a)(4)(A), on the grounds that debtor made false and fraudulent statements regarding his income and expenses, and his company's assets and liabilities, with the intent to deceive the creditors and the Bankruptcy Court.

On appeal, Bub argues that the November 13 Order should be reversed and that he should be granted a discharge, or that the case be remanded for an evidentiary hearing, because the Bankruptcy Court erroneously concluded that Bub falsely and intentionally underrepresented his income and the amount of funds he drew from his business, The Storage Guys, Inc. ("The Storage Guys"); misrepresented his monthly expenses; and misrepresented The Storage Guys' assets and liabilities. Bub argues that the Bankruptcy Court did not thoroughly analyze the evidence and should have sought additional information, and that the evidence does not support a finding of falsehoods or intent to deceive. Appellee Rockstone Capital, LLC ("Rockstone") opposes and argues, *inter alia*, that, in addition to the false statements in Bub's Schedules and Statement of Financial Affairs, upon which the Bankruptcy Court correctly relied in reaching its determination, "[t]he court properly detailed wrongful conduct to demonstrate that Debtor has engaged in a long campaign of hiding assets and of false statements under oath in his efforts to evade legitimate efforts of creditors to recover on

their claims and that Debtor's falsehoods continued in his bankruptcy schedules and his evasive testimony at the trial of this action." (Appellee's Brief, at 3.)

For the reasons set forth below, the Court finds debtor's arguments on appeal to be unpersuasive and affirms the Bankruptcy Court's November 13 Order. Specifically, having carefully reviewed the record, the Court concludes that the Bankruptcy Court's determination that debtor made several false statements knowingly and with fraudulent intent was not clearly erroneous. Therefore, the Bankruptcy Court did not err in entering judgment in favor of Rockstone on its third, fourth, and fifth causes of action.[1]

I. BACKGROUND

A. Facts[2]

Rockstone is a creditor of debtor pursuant to a judgment entered in New York State Supreme Court, Suffolk County, on May 27, 2009, in the amount of $632,466.80. (Complaint Objecting to Discharge ¶ 2, R-1.) The debt arose in connection with a loan guaranteed by debtor and made by Rockstone to one of debtor's former businesses. (Bankr. Ct. Op., at 4.) Debtor owned and operated several businesses related to computer consulting for small businesses over the course of his professional career. (T-41–43.) As of the petition date, debtor's sole source of income came from The Storage Guys, a computer consulting business owned entirely by debtor. (Bankr. Ct. Op., at 4; *see* Schedule I, ER-1 (Voluntary Petition & Exhibits).)

In his Chapter 7 Bankruptcy Petition, debtor listed that he had $91,000 in real property assets, $114,437.13 in personal property assets, $1,531,703.12 in liabilities to creditors holding secured claims, and $32,861.16 in liabilities to creditors holding unsecured non-priority claims; that his current income was $4,447.24; that his current expenditures were $4,423.09; and that he had no domestic support obligations. According to Schedule I, $1,110 of plaintiff's income came from his girlfriend's contribution to household expenses. Therefore, plaintiff's monthly income from his business was $3,837.24.

On Schedule B, Bub listed a one hundred percent ownership interest in Country Road 332 LLC, with an "unknown" value. (Schedule B, at 2.) Country Road 32 LLC owns one-third of a condominium in Gainesville, Florida (the "Gainesville Condo"). (*See* T-48–49.) The other owners are Barbara Anzalone (debtor's first wife) and Joshua Bub (debtor's adult son). (*Id.* at 49.) Debtor's older daughter and her fiancé live in the condominium and do not pay rent. (Bankr. Ct. Op., at 5; T-113.) On Schedule D, debtor disclosed that he is obligated to Wells Fargo Home Mortgage in the amount of $124,472.40. (Schedule D, at 2.) The obligation is secured by a mortgage

---

[1] The Court would reach the same conclusion even under a *de novo* standard of review, for the reasons discussed in the November 13 Order and herein.

[2] Bub does not claim that the Bankruptcy Court incorrectly detailed the facts in the November 13 Order (*See* Docket No. 1-9). Instead, he objects to the conclusions drawn from those facts, and to the absence of further evidentiary analysis. Therefore, the Court draws the facts from the November 13 Order, and from other facts that were admitted in evidence at the trial and are in the appellate record. "R___" refers to the numbered documents in the record filed with the Court on January 24, 2014. (*See* Docket No. 1.) "T___" refers to the transcript of the trial proceedings before the Bankruptcy Court on February 12, 2013. (*See* R-8.) "EB___" refers to the lettered documents in the record filed with the Court on February 18, 2014, and "ER___" refers to the numbered documents in the record filed with the Court on February 18, 2014. (*See* Docket No. 6.)

on the Gainesville Condo, which debtor valued at $100,000.[3] (*Id.*) On Schedule J, debtor listed a rent or home mortgage payment expense in the amount of $550.00 per month. (Schedule J, at 1.) He also listed an expense in the monthly amount of $135.00 for a maintenance fee. (*Id.* at 2.) At trial, Bub testified that this was his monthly "contribution toward a mortgage payment on [the] condo." (T-112.) He stated that he was making the payments, despite not having any ownership interest, in lieu of repaying arrears owed to his ex-wife in connection with unpaid child support. (*Id.* at 113–14.) Debtor also testified that he stopped making payments around the time he filed the petition because he could no longer afford to make them. (*Id.* at 120.) Debtor did not amend Schedule J to correct the nature of this expense, and he did not delete it as an expense after he stopped paying. At trial, debtor stated that he listed it because "[i]t's something I had been paying. And that's what I understood this [Schedule J] to be. It's my expenses."[4] (*Id.*)

The Bankruptcy Court found that "there is no documentary evidence to support a monthly rental or mortgage expense in this amount [$550]." (Bankr. Ct. Op., at 8.) Bank account records reflect that, for approximately one year prior to the petition date, monthly transfers in the amount of $1100 were made from a TD Bank account in the name of The Storage Guys to Bub's personal bank account. (*Id.*; *see* The Storage Guys Bank Account Statements, ER-6; Bub Bank Account Statements, EB-1.) In addition, each month, an electronic payment in the amount of $1,093.97 was made from Bub's account to Wells Fargo Home Mortgage. (Bankr. Ct. Op., at 8; *see* Bub Bank Account Statements.) Neither bank account reflects a monthly payment or debit in the amount of $550 (or $685). (Bankr. Ct. Op., at 8.) The Bankruptcy Court thus concluded that "[t]his documentary evidence contradicts the Debtor's testimony and supports the conclusion that the Debtor was paying the entire monthly mortgage on the Gainesville Condo with funds generated from The Storage Guys for the entire year prior to the Petition Date."[5] (*Id.* at 8–9.)

On Schedule B, debtor listed his stock interest in The Storage Guys. (Schedule B, at 2.) He indicated that The Storage Guys had "[n]o assets," and he valued his stock interest at zero. (*Id.*) At the same time, however, The Storage Guys' bank account balance was approximately $19,000. (T-110.) At trial, debtor testified that he wrote "no assets" in his disclosure because, as of the petition date, The Storage Guys had no "net" assets. (*Id.*) Debtor reached this conclusion by offsetting the assets with The Storage Guys' corresponding $19,000 liability to Chase Manhattan Bank as of the petition date—an obligation personally guaranteed by debtor. (*Id.* at 110–11;

---

[3] Debtor no longer has an ownership interest in the Gainesville Condo, but he and Anzalone are obligors on the note. (Bankr. Ct. Op., at 5 n.2; *see* T-49.)

[4] No documentary evidence before the Bankruptcy Court supported debtor's claim that he was paying the mortgage and maintenance fee to satisfy a prior divorce support obligation. (*See* Bankr. Ct. Op., at 8.) Bub has submitted an affidavit from Anzalone with his brief to this Court, but the Court cannot consider it as part of the record on appeal. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 46 (2d Cir. 2000) (finding that evidence submitted for the first time on appeal was "simply not part of the record" and "cannot be considered in deciding this case"). Regardless, as set forth *infra*, even if the Court were to consider this affidavit, it does not support a conclusion that the Bankruptcy Court's findings were clearly erroneous. In addition, Bub, in his brief to this Court, admits that these "were not rightly debtor's own living expenses." (Debtor's Brief, at 5.)

[5] Debtor did not address this discrepancy in his filings with this Court.

Schedule F, at 2.)

In his Statement of Financial Affairs, debtor listed a Chase (Southwest.com) credit card (the "Southwest Card") in his name, which he claimed was used solely for business expenses and paid directly by The Storage Guys. (Statement of Financial Affairs, at 2 (stating that payments were made "with funds from business, for business debts").) He also disclosed that $15,516.54 in payments was made to the card over the ninety days prior to the petition date. (*Id.*) Exhibits produced at trial, however, indicated that many of the charges on the Southwest Card were for personal items. For example, there was a recurring charge of $500.00 for an entity named "Natural Image Long Island"—an expense for personal grooming—and charges from supermarkets, pharmacies, dry cleaning establishments, and other retail stores. (Bankr. Ct. Op., at 9–10; *see* Chase Southwest Card Statements, EB-1.) According to the Bankruptcy Court, "[b]ased on an informal and conservative review of the expenses charged on the Chase Southwest Card for the ninety days prior to the Petition Date, an average of $2594.00 per month was charged for personal items unrelated to the business of The Storage Guys."[6] (Bankr. Ct. Op., at 10.)

At trial, Bub testified that he believed he was one and the same as The Storage Guys, and therefore The Storage Guys paid debtor's personal expenses in lieu of salary. (*See* T-119 ("Q. Okay. So when the company pays the electric bill, you sort of think that's yourself paying it because you are the company? A. Correct."); *id.* at 116 ("Q. Okay. It's true though, is it not sir, that your company, The Storage Guys, in fact paid that electric bill? A. Yes. Q. So the statement, at least insofar as the portion that's attributable to electric is that you're paying this as an individual expense is incorrect, because it's paid by your company? A. Well, since I'm the one hundred percent shareholder in my company, it is my company. And when I need money to pay bills that's what I use. Because I don't take a salary.").)

On Schedule I, Bub listed a monthly income of $3,837.27 from his employment at The Storage Guys.[7] (Schedule I, at 1.) He also listed a monthly contribution towards household expenses in the amount of $1,100 from Susan Lane, his current girlfriend (*id.*); a monthly health insurance expense in the amount of $661.00 (*id.* at 2); and monthly electricity and heating expenses in the amount of $385 (*id.*). The Storage Guys Bank Account statements reflect monthly debits for the electricity bill, in amounts varying form $125.33 to $261.21. (Bankr. Ct. Op., at 11; *see* The Storage Guys Bank Account Statements.) Debtor also acknowledged that his monthly health insurance in the amount of $661 is paid from that account. (T-120.) He explained that his accountant calculated the monthly income based on the transfers made by The Storage Guys to and on behalf of debtor. (*Id.* at 190.)

At trial, Bub acknowledged that, during the two months before the petition date, The Storage Guys, on Bub's behalf, paid his bankruptcy counsel approximately $7,500 and his son $6,840 as a gift. (*Id.*) Bub did not know if the sum of those payments—

---

[6] Bub has not taken issue with the Bankruptcy Court's calculation. Nevertheless, this Court has conducted its own review of the Chase Southwest Card statements and finds no basis to conclude that the Bankruptcy Court's estimate is clearly erroneous.

[7] Bub listed his 2011 salary in his Statement of Financial Affairs as $27,500. Averaged over twelve months, the monthly income would be $2,291.67.

almost $14,000—was included in his income calculation. (*Id.*) According to debtor, his accountant calculated his monthly income and expenses over a period of time, based on his books and records, and divided the number by the number of months reviewed, to come up with the amounts listed in the schedules to the petition. (*Id.* at 190–91.)

In its opinion, the Bankruptcy Court performed the following calculation. It took the $1,100 per month transfer to debtor's personal bank account, added that amount to the monthly insurance and utility expense paid by The Storage Guys on behalf of Bub (approximately $861, assuming the business paid about $200 of the utility expense), and amortized the payments to counsel and debtor's son over twelve months. (Bankr. Ct. Op., at 12.) This resulted in a monthly "salary" from the business of approximately $3,060. (*Id.*) The court noted, however, that this number did not include the personal expense charges on the Southwest Card, which averaged $2,594 per month at a minimum. (*Id.*) The total of those numbers, the court noted, would exceed the monthly income listed in Schedule I by about $1,800, and exceed the annual salary listed in the Statement of Financial Affairs by over $3,000 per month. (*Id.*)

### B. Bankruptcy Proceedings

On November 22, 2011, Bub filed a voluntary petition for relief in the Bankruptcy Court pursuant to Chapter 7 of the Bankruptcy Code. (R-9, at 3.) Bub's gross estate exceeds $130,000, and Rockstone is Bub's largest unsecured creditor, having filed a proof of claim in the amount of $774,225.35 based on a judgment against Bub. *Rockstone Capital LLC v. Metal*, No. 13-CV-5161 (JFB), 2014 WL 13334265, at *4 (E.D.N.Y. Apr. 2, 2014).

On April 19, 2012, Rockstone commenced an adversary proceeding against Bub, seeking to deny his discharge pursuant to 11 U.S.C. § 727(a)(4)(A), based on false statements made by debtor in the petition, schedules, and statement of financial affairs. Rockstone claimed that Bub (1) falsely listed an ownership interest in three vehicles as of the date the petition was filed because the transfer of ownership from his minor son was not completed until post-petition; (2) provided false and fraudulent values for the three vehicles in his schedules and falsely claimed a vehicle exemption in one of the vehicles in the hopes of buying one of the vehicles back from the estate for less than it was actually worth; and (3) falsely and fraudulently overstated his expenses and understated his income. Rockstone claimed that these false oaths were made in order to deceive the creditors and the Bankruptcy Court regarding debtor's true financial condition. (*See generally* R-1.)

After a trial on February 12, 2013, the Bankruptcy Court issued a Memorandum Decision Denying the Debtor's Discharge on November 13, 2013. The Bankruptcy Court held that debtor's statements regarding the three vehicles were neither false nor fraudulent, and, therefore, it dismissed Rockstone's first two causes of action. The court, however, determined that "the causes of action regarding the false and misleading representations in the Debtor's petition and schedules relative to his income and expenses, which were the subject of minimal discussion during the trial but are fully set forth in the evidentiary record, do present a clear basis for the denial of the Debtor's discharge." (Bankr. Ct. Op. at 2.) The Bankruptcy Court summarized its conclusion as follows:

> As a result of the misstatements, including the Debtor's failure to disclose all of the income he derived

from his wholly owned business, the Debtor's monthly income was understated by at least $1,800.00. The Debtor accomplished this by falsely representing in the statement of financial affairs that he used a personal credit card solely for business expenses, when in fact this credit card was used for business and personal expenses. The Debtor's explanation that he relied on his accountant's calculations to prepare Schedules I and J does not support his defense. Neither the total amount of income listed, nor the individual expenditures themselves, bear any relationship to the Debtor's actual income and expenses, based on the Debtor's own financial records. Furthermore, the Debtor's explanation that he and his solely owned business are one and the same, so he had the right to run his personal expenses through the bank account for the business, does not absolve the Debtor in this case. Regardless of whether he used his solely owned business as his personal piggy bank, it is the Debtor's failure to include as income all of the funds he took from this business for his own personal benefit, the fact that the Debtor's listed income and expenses are not supported by the documentary evidence, along with his misrepresentation in the petition that the Debtor's business had no assets, that warrant denial of the Debtor's discharge. Based on the foregoing, the Debtor's discharge is denied pursuant to 11 U.S.C. § 727(a)(4)(A).

(*Id.* at 2–3.)

The court entered the Judgment Denying the Debtor's Discharge on November 13, 2013. (Notice of Appeal, at 5.)

### C. Appeal

Appellant filed a notice of appeal of the November 13, 2013 Order in the Bankruptcy Court on November 26, 2013, which was docketed in this Court on January 24, 2014. Appellant filed his brief on March 12, 2014. Rockstone filed its brief on March 28, 2014. Appellant did not file a reply. The Court has fully considered the parties' submissions.

## II. STANDARD OF REVIEW

Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that a reviewing court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree," or it may "remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.

The Court reviews the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error. *See Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 65 (2d Cir. 2007) ("The Bankruptcy Court's legal conclusions are reviewed *de novo* and its factual conclusions are reviewed for clear error."); *see Bankruptcy Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d 432, 449 (2d Cir. 2008); *Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.)*, 209 F.3d 100, 103 (2d Cir. 2000); *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs Inc.)*, 922 F.2d 984, 988–89 (2d Cir. 1990). "'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 610 F.3d 44, 51 (2d Cir. 2010) (quoting

*United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)); *see also Collins v. Hi-Qual Roofing & Siding Materials, Inc.*, Nos. 02-CV-0921E(F), 02-CV-0922E(F), 2003 WL 23350125, at *4 n.16 (W.D.N.Y. Dec. 18, 2003) ("'[A] finding is only clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . This standard precludes this Court from reversing the Bankruptcy Court's decision if its account of the evidence is plausible, even if this Court is convinced that it would have weighed the evidence differently." (quoting *In re B. Cohen & Sons Caterers, Inc.*, 108 B.R. 482, 484 (E.D. Pa. 1989))).

### III.  DISCUSSION

A.  Denial of a Discharge Pursuant to 11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A) of Title 11 of the United States Code ("Section 727") provides:

(a) The court shall grant a debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case--

(A) made a false oath or account.

11 U.S.C. § 727(a)(4)(A). Because Section 727 "impos[es] an extreme penalty for wrongdoing, [it] must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." *D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 234 (2d Cir. 2006) (quotations and citation omitted); *see also Berger & Assocs. Attorneys, P.C. v. Kran (In re Kran)*, 493 B.R. 398, 403 (S.D.N.Y. 2013) (accord). "The objecting creditor bears the burden to establish the requirements of § 727 by a preponderance of the evidence." *Virovlyankaya v. Virovlyanskiy (In re Virovlyanskiy)*, 485 B.R. 268, 272 (Bankr. E.D.N.Y. 2013); *Moreo v. Rossi (In re Moreo)*, 437 B.R. 40, 59 (E.D.N.Y. 2010); *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (E.D.N.Y. 2000).

To prove an objection to discharge under § 727(a)(4)(A), the party objecting to discharge must establish by a preponderance of the evidence that: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew that the statement was false; (4) the debtor made the statement with intent to deceive; and (5) the statement related materially to the bankruptcy case." *In re Moreo,* 437 B.R. at 59 (quotations and citation omitted); *see also Republic Credit Corp. I v. Boyer (In re Boyer)*, 328 F. App'x 711, 715 (2d Cir. 2009).

The materially false statements recognized under this subsection may have been made as part of or omitted from the bankruptcy petition, schedules, statement of affairs, or during examinations or the bankruptcy proceeding itself. *E.g.*, *New World Rest. Grp., Inc. v. Abramov (In re Abramov)*, 329 B.R. 125, 132 (E.D.N.Y. 2005); *see also Pergament v. Smorto (In re Smorto)*, No. 07-CV-2727 (JFB), 2008 WL 699502, at *4 (E.D.N.Y. Mar. 12, 2008) (same). Further, "the debtor must have presented or used, with intent to defraud, inflated or fictitious claims in a bankruptcy case." *Perniciaro v. Natale (In re Natale)*, 136 B.R. 344, 349 (Bankr. E.D.N.Y. 1992); *see also Dranichak v. Rosetti*, 493 B.R. 370, 378 (N.D.N.Y. 2013); *Painewebber Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 439 (S.D.N.Y. 1996). "In either case, whether it be a false statement under oath or use of a false claim, the wilful intent to defraud is a

7

crucial element of the cause of action." *Natale*, 136 B.R. at 349. Intent to defraud can be proven by evidence of either (1) the debtor's actual intent to deceive or (2) reckless disregard for the truth. *Adler v. Lisa Ng (In re Adler)*, 395 B.R. 827, 843 (E.D.N.Y. 2008); *see also Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 667 (Bankr. S.D.N.Y. 2008) (citations omitted). Intent to defraud, however, "will not be found in cases of ignorance or carelessness." *Gardner*, 384 B.R. at 667.

Because "[f]raudulent intent is rarely susceptible to direct proof[,] . . . courts have developed 'badges of fraud' to establish the requisite actual intent to defraud." *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983) (internal citation omitted) (quoting *In re Freudmann*, 362 F. Supp. 429, 433 (S.D.N.Y. 1973), *aff'd* 495 F.2d 816 (2d Cir. 1974) (per curiam)). "Badges of fraud" include secreting proceedings of a transfer, transferring property to family members, the lack or inadequacy of consideration, the general chronology of the events or transactions in question, and the concealment of relevant facts. *See id.* at 1582–83 (quoting and citing cases). Further, "[w]here there has been a 'pattern' of falsity, or a 'cumulative effect' of falsehoods, a court may find that [fraudulent] intent has been established." *Monety Corp. v. Maletta (In re Maletta)*, 159 B.R. 108, 112 (Bankr. D. Conn. 1993) (citation omitted). With respect to reckless indifference to the truth, the Second Circuit has recognized that fraudulent intent may be inferred from a series of incorrect statements and decisions contained in the schedules. *See Dubrowsky v. Estate of Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 571–72 (E.D.N.Y. 2000) ("[I]t is important to note that under section 727(a)(4)(A), a reckless indifference to the truth is sufficient to sustain an action for fraud." (citations omitted)); *Castillo v. Casado (In re Casado)*, 187 B.R. 446, 450 (Bankr. E.D.N.Y. 1995) (citing, *inter alia*, *Diorio v. Kreister–Borg Constr. Co.*, 407 F.2d 1330, 1331 (2d Cir. 1969); *Kaiser*, 722 F.2d at 1583 n.4)); *see also Smorto*, 2008 WL 699502, at *6 (citing cases).

Once the moving party meets its initial burden to produce evidence of a false statement, "the burden of production then shifts to the debtor[] to produce a 'credible explanation' for making the 'false and fraudulent representations,'" *Cadles of Grassy Meadows II, L.L.C. v . St. Clair (In re St. Clair)*, No. 13-mc-1057(SJF), 2014 WL 279850, at *7 (E.D.N.Y. Jan. 21, 2014) (quoting *Moreo*, 437 B.R. at 59), or to "prove that it was not an intentional misrepresentation," *Gardner*, 384 B.R. at 668 (citations omitted). "Courts may consider the debtor's education, business experience, and reliance on counsel when evaluating the debtor's knowledge of a false statement, but the debtor is not exonerated by pleading that he or she relied on patently improper advice of counsel." *Maletta*, 159 B.R. at 112 (quoting *Zitwer v. Kelly (In re Kelly)*, 135 B.R. 459, 462 (Bankr. S.D.N.Y. 1992)).

### B. Application

Bub contends that the Bankruptcy Court's findings of falsity and fraudulent intent were clearly erroneous. For the following reasons, the Court affirms the Bankruptcy Court's November 13 Order.

#### 1. Falsity of Statements

Based on the record developed before and during the trial, the Bankruptcy Court correctly determined that the following statements by debtor were material falsehoods: (1) the claim that he paid $550 in mortgage expenses; (2) the claim that he had a monthly income from The Storage

Guys of $3,837.24; and (3) the claim that The Storage Guys had no assets and only $19,000 in liabilities.

First, debtor contends that, although the mortgage payments were not actually his living expenses, they were the result of a prior divorce support obligation to his ex-wife. Debtor argues that the Bankruptcy Court should have requested evidence to corroborate the child support arrears justification. (Debtor's Brief, at 5–6.) The Court disagrees. Even crediting debtor's explanation, it is evident that the statements were false in three material respects: (1) Schedule J provides that debtor made payments of $550 on the home mortgage, not the $1,093.97 that he actually transferred from his bank account to Wells Fargo each month (*see* Bankr. Ct. Op., at 20); (2) based on debtor's testimony, the nature of the $550 expense was not to cover debtor's mortgage obligation, but to cure a child support arrears, and debtor never disclosed in Schedules E or J that he had any domestic support obligations (*see* Schedules E, J; T-113–14 (testimony that debtor made payments in lieu of repaying arrears owed to ex-wife)); and (3) debtor never amended his statements to state that he stopped making the payments around the time of the petition (*see* T-120)). Therefore, the Bankruptcy Court's conclusion that debtor made a false statement about his mortgage expenses was not clearly erroneous.

Second, debtor argues that the Bankruptcy Court erred in its analysis of his monthly income because (1) unlike debtor's accountant, the court improperly amortized the "one-time expenses" of his legal bill to his bankruptcy lawyer and his gift for his son's wedding ($14,340); and (2) if the court added the amortized monthly sum of $1,195 to the extra $685 paid for the mortgage and condominium maintenance fee, the total—$1880—would amount approximately to the $1800 the Bankruptcy Court found was missing from the monthly expense and income schedules. (Debtor's Brief, at 6.) Debtor, however, misreads the Bankruptcy Court's opinion, and his argument does not address the discrepancies identified in the November 13 Order.

Specifically, the Bankruptcy Court focused on debtor's claim that the Chase Southwest Card was used solely for The Storage Guys' business expenses. The Bankruptcy Court found, however, that for the three months prior to the petition date, Bub used the Chase Southwest Card for personal expenses in the amount of at least $2,594 per month. (Bankr. Ct. Op., at 21–22.) This Court has reviewed the Chase Southwest Card statements for the months in question and finds that the Bankruptcy Court's calculation was not clearly erroneous; arguably, it was generous to debtor. (*See generally* Chase Southwest Card Statements.) On appeal, debtor proffers no explanation for his failure to report as income the expenses he charged on the Chase Southwest Card or for his false representation in the Statement of Financial Affairs that the card was used solely for business purposes. In addition, debtor's income calculation ignores the fact that the Bankruptcy Court included the additional mortgage payments in its calculation. (*See* Bankr. Ct. Op., at 12, 22 (adding $1,100 in mortgage payments).) Further, even if one subtracts the attorney fee and gift payments from the monthly income calculation, there is no logical way to reach debtor's claimed $3,837.24 monthly income. For instance, absent the Chase Southwest Card expenses, the monthly income would be markedly below the claimed amount. On the other hand, including the Chase Southwest Card expenses of approximately $2,594, the mortgage payments of $,1100, and the maintenance fee of $135, the total is $3,829. That amount, however, does not include

other personal expenses paid by The Storage Guys (that Bub concedes were part of his income), and which would bring the total monthly income amount well above the claimed amount. (*See* T-190 (testifying that monthly income listed in Schedule I included expenses for home electricity and health insurance).) Therefore, the Bankruptcy Court's conclusion that debtor made a false statement by underrepresenting his monthly income from The Storage Guys was not clearly erroneous.

Third, the Bankruptcy Court concluded that debtor made a false statement with respect to The Storage Guys' assets and liabilities when he stated that the business had no "net assets," and did not list his own assets and liabilities as the company's assets and liabilities despite testifying "at trial that he and The Storage Guys were one and the same." (Bankr. Ct. Op., at 23.) Debtor argues that the Bankruptcy Court erred because (1) The Storage Guys is a separate legal entity, and just because he was paid on the basis of distributions did not mean his assets and liabilities were the company's; and (2) both he and The Storage Guys "had no assets . . . having rightfully given all of [the] assets to the Bankruptcy Trustee." (Debtor's Brief, at 7.) Debtor's second argument is frivolous. His first argument is unpersuasive.

As Rockstone notes, debtor testified that there was no difference between himself and The Storage Guys—at least when it came to his income and expenses. (*See* T-116 ("Well, since I'm the one hundred percent shareholder in my company, it is my company. And when I need money to pay bills that's what I use. Because I don't take a salary."); *id.* at 119 ("Q. Okay. So when the company pays the electric bill, you sort of think that's yourself paying it because you're the company? A. Correct."); *id.* at 141 ("But I am the Storage Guys . . . .").)

Debtor, however, never attributed any of The Storage Guys' liabilities to his own, and vice versa. Given this testimony, the Bankruptcy Court did not err in concluding that debtor ignored corporate formalities and consequently should have attributed his own assets and liabilities to The Storage Guys, and vice versa. *See Pisculli v. T.S. Haulers, Inc. (In re Pisculli)*, 426 B.R. 52, 60–61 (E.D.N.Y. 2010) [hereinafter *In re Pisculli II*] (explaining that "the corporate veil will be pierced to achieve equity, even absent fraud, [w]hen a corporation has been so dominated by an individual . . . and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego" (quoting *Williams v. Lovell Safety Mgmt. Co., LLC*, 896 N.Y.S.2d 150, 151 (N.Y. App. Div. 2010)) (alteration in original)); *T.S. Haulers, Inc. v. Pisculli (In re Pisculli)*, Nos. 805-89678-reg, 806-8335-reg, 806-8337-reg, 2009 WL 700059, at *3 (Bankr. E.D.N.Y. Mar. 4, 2009) [hereinafter *In re Pisculli I*] ("Ordinarily, the stock of a debtor's closely owned corporation, and consequently the value of its assets, after payment of the corporation's debts, is property of a debtor's bankruptcy estate.")). Therefore, the Bankruptcy Court's conclusion that debtor made a false statement about The Storage Guys' assets and liabilities was not clearly erroneous.

2. Intent to Defraud

On appeal, debtor argues that the Bankruptcy Court erred in finding that debtor had intent to defraud because (1) the Bankruptcy Court did not credit the veracity of debtor's claim that he was paying the mortgage expenses to cure child support arrears; (2) debtor properly relied on his accountant's analysis, and any discrepancy in his monthly income calculation was not intentional; and (3) the Bankruptcy Court recognized that debtor's statement regarding

The Storage Guys' assets and liabilities, standing alone, would not suffice to deny the discharge. As discussed below, viewing the misstatements and omissions individually and collectively, there was ample evidence in the record to support the reasoned conclusion by the Bankruptcy Court.

With respect to the mortgage expenses, the Bankruptcy Court found it unnecessary to determine why debtor "deceived the Court and the creditors, only to determine whether he has done so. . . . The only conclusion the Court can draw from [debtor's failure to correctly list the monthly expense] is that the Debtor intentionally failed to disclose that he was paying the note . . . in full." (Bankr. Ct. Op., at 21.) In *Dubrowsky*, the court held that the "gross discrepancy . . . coupled with the omission of the jointly owned property evidences, at the minimum, a reckless disregard for the truth which has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." 244 B.R. at 575–76 (citation omitted); *see also MacLeod v. Arcuri (In re Arcuri)*, 116 B.R. 873, 881 (Bankr. S.D.N.Y. 1990) ("[D]e minimis value . . . may tend to vitiate the debtor's fraudulent intent"). Here, debtor has presented no evidence in the record suggesting that his failure to disclose the $1,100 in mortgage payments ($550 of it, at least, to address an undisclosed child support obligation) was an innocent oversight. These were not insignificant omissions in the disclosures, debtor benefited from the additional income he drew from his business, and it is irrelevant that debtor believes he legally was obligated to make those payments. *See Sanderson v. Ptasinski (In re Ptasinski)*, 290 B.R. 16, 23 (Bankr. W.D.N.Y. 2003) ("[I]f items were omitted from the debtor's schedules because of an honest mistake . . . such a false declaration may not be sufficiently knowingly and fraudulently made so as to result in a denial of discharge."). Therefore, the Court finds that the Bankruptcy Court had ample basis to conclude that debtor intentionally misrepresented his expenses to create a false picture of his financial circumstances to the creditors and the Court.

With respect to the monthly income, the Bankruptcy Court concluded that debtor knew that the income listed in Schedule I was false and covered it up by making a false representation about the use of the Chase Southwest Card. (Bankr. Ct. Op., at 22.) The court reasoned that debtor's scheme was to use The Storage Guys "to hide his true income and expenses to deceive the creditors and the Court," and that there was no justifiable purpose for his failure to disclose all his income. (*Id.* at 23.) As noted *supra*, on appeal, debtor does not discuss the Chase Southwest Card charges at all, and he misunderstands the Bankruptcy Court's analysis. He also proffers no evidence demonstrating that his omissions were innocent or otherwise excusable. Debtor's reliance on his accountant's evaluation is unavailing, because "it is transparently plain" that the actual use of the Chase Southwest Card should have been disclosed. *Dubrowksy*, 244 B.R. at 573 ("[E]ven the advice of counsel is not a defense to a charge of making a false oath or account when it is transparently plain that the property should be scheduled. (citations omitted)). Therefore, there is no basis to disturb the Bankruptcy Court's determination that debtor acted with fraudulent intent as to those statements.

Finally, with respect to The Storage Guys' assets and liabilities, the Bankruptcy Court found fraudulent intent based on debtor's pattern of wrongful behavior. (Bankr. Ct. Op., at 23–24.) In particular, the court explained:

According to the Plaintiff, the

Debtor's listing of the liabilities of The Storage Guys in his petition, and not the $19,000 in the bank account for The Storage Guys, constitutes grounds to deny the Debtor's discharge as well. The Debtor admits to stating in Schedule B that The Storage Guys had no assets. His explanation for this representation is that because The Storage Guys owed a debt to Chase bank in the approximate amount of $19,000.00, The Storage Guys had no "net assets." However, this excuse does not ring true. The Debtor testified at trial that he and The Storage Guys were one and the same. Therefore, the assets and liabilities of The Storage Guys were his own assets and liabilities. In order to be consistent, the Debtor had to list both, and he did not. If this were his only questionable statement in the petition, perhaps the Debtor's explanation would persuade the Court to find that the Debtor did not have the requisite intent to deceive the Court. However, this is one in a series of false statements which, standing together, show a pattern of deceptive behavior on the part of the Debtor. As courts have recognized, evidence of a "pattern of wrongful behavior" presents a more compelling case of intent to defraud than does an isolated instance of an omission by a debtor. Such is the case with this Debtor. In addition, the Debtor's testimony was evasive and lacked credibility, as it was contradicted by his own exhibits. This is not the honest debtor who deserves a fresh start.

(*Id.* (citations omitted).) Although Bub objects to this finding, this Court finds his objection to be without merit. The alleged misrepresentation, along with the other statements at issue, should not simply be examined in isolation when determining whether debtor acted with fraudulent intent or with reckless indifference to the truth, but rather should also be examined collectively in conjunction with the other evidence before the Bankruptcy Court. Here, when each of the statements is considered as whole in the context of the entire record, there is no basis to conclude that the Bankruptcy Court erred in its characterization of debtor's scheme and in its finding of fraudulent intent.

It is evident that debtor, who had business experience and at least some financial sophistication, repeatedly made material omissions and misrepresentations in his bankruptcy petition, schedules, and other submissions to the Bankruptcy Court. Such a pattern of behavior, as the Bankruptcy Court noted, supports a finding of fraudulent intent based, at least, on reckless indifference to the truth. *See, e.g.*, *IBA, Inc. v. Hoyt (In re Hoyt)*, 337 B.R. 463, 468 (W.D.N.Y. 2006) (referencing that debtor was a "sophisticated businessman" in finding fraudulent intent and denying debtor's discharge); *Dubrowksy*, 244 B.R. at 571–72. Further, a bankruptcy judge's "intent" determination often relies heavily upon the judge's evaluation of the credibility and demeanor of the debtor. *See, e.g.*, *Essenfeld v. Schultz (In re Schultz)*, 239 B.R. 664, 668 (E.D.N.Y. 1999) ("As the judge hearing the testimony and viewing the witness, Judge Conrad was clearly in the best position to make this type of decision and this Court will not interfere with Judge Conrad's factual conclusions."). Thus, deference is given to the original factfinder because of that court's superior position to make determinations of credibility. *See, e.g.*, *Tully*, 818 F.2d at 109 (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)). In the instant case, the Bankruptcy Court

considered the credibility and demeanor of debtor and found him to be evasive and lacking credibility. (Bankr. Ct. Opp., at 24.) Debtor has pointed to no evidence that would support a finding that the Bankruptcy Court's determination on the issue of his credibility and intent was erroneous.

In sum, after careful review of the record and debtor's arguments, the Court concludes that the Bankruptcy Court did not err in finding that debtor made the false statements knowingly and with fraudulent intent, and did not err in entering judgment for Rockstone on its third, fourth, and fifth causes of action in the adversary proceeding.

## IV. CONCLUSION

For the foregoing reasons, the Court affirms the order and judgment of the Bankruptcy Court in its entirety. The Clerk of the Court shall close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 25, 2014
Central Islip, New York

\*\*\*

Debtor proceeds *pro se*. Rockstone is represented by Paul A. Levine of Lemergy Greisler, LLC, 50 Beaver Street, Albany, NY 12207.